# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| **Christopher D. Crockett,** ) | |
|     **Plaintiff,** ) | |
| ) | |
| v.                ) | 1:19cv893 (AJT/TCB) |
| ) | |
| **Sergeant Talley, et al.,** ) | |
|     **Defendants.** ) | |

### MEMORANDUM OPINION

Christopher Crockett, a Virginia inmate, has brought a civil-rights suit, see 42 U.S.C. § 1983, against Investigator Fendall Vaughan, Lieutenant Gerald Whitebread, Corporal Nicole Brewton, Sergeant Kevin Talley, Sergeant Nicholas Sample, Officer Montreal Beasley, and Sergeant Claiborne—officials at Riverside Regional Jail ("RRJ" or "the jail")—claiming that he was subjected to unlawful retaliation, excessive force, unconstitutional conditions of confinement, and interference with his access to the courts. The defendants move for summary judgment for all Crockett's claims except for the retaliation claim. [Dkt. No. 45]. They have provided Crockett, a pro se litigant, with the notice required by Local Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), [Dkt. No. 45], and Crockett has filed nothing in opposition, relying instead on his verified, second amended complaint ("SAC") [Dkt. No. 24]. Because the undisputed evidence demonstrates that no defendant interfered with Crockett's right to access the courts or subjected him to unconstitutional conditions of confinement, defendants are entitled to summary judgment in their favor for those claims. Disputes of material fact on Crockett's claims of excessive force, however, preclude summary judgment on those claims, and, thus, the defendants' motion will be granted in part and denied in part.

## I. Background

The facts recounted below were extracted from the verified SAC and defendants' statement of undisputed facts, which is supported by evidence, including video footage from RRJ, affidavits, and jail records. Because the SAC is verified, it is treated as "the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." See Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021) (internal citation omitted).

### A) The Verified SAC

Crockett avers that around 4:30 p.m. on February 15, 2019, he submitted to Corporal Brewton[1] a grievance complaining about Sergeant Talley's handling of a disciplinary offense report. [SAC ¶¶ 4–5]. According to Crockett, Brewton then notified the other defendants about the grievance and directed them to remove him from general population. [Id. ¶ 7]. Then, "[i]n a group the Defendants moved in on [Crockett]." [Id.]. In particular, Crockett attests that while he lay on the bottom bunk in his cell with the lights turned off, Sergeant Talley and Sergeant Sample entered and ordered him to get dressed. [Id. ¶ 9]. "[S]uddenly," Crockett continues, Sergeant Talley "grabbed [him] . . . around the neck . . . in a choking maneuver," rendering it difficult for him to breathe. [Id. ¶ 10]. Crockett further avers that Sergeant Sample then "grabbed [Crockett] by the legs, and swept [him] off his feet smashing [the] right side of [Crockett's] head on the steel table." [Id.]. Crockett adds that he fell face first on the ground, after which Sergeant Sample stomped his boot on Crockett's face, rib cage, and stomach. [Id. ¶ 11]. Meanwhile, Crockett avers, Sergeant Talley punched Crockett's right side, near his rib cage, kneed him on

---

[1] Crockett refers to this defendant as "Corporal Bruton," whom defendants have identified as Corporal Nicole Brewton. For the sake of consistency, she is referred to as Corporal Brewton throughout this Memorandum Opinion.

the lower spine, and struck him in the mouth with a closed fist, knocking out one of Crockett's front teeth, which he accidentally swallowed while yelling for help. [Id. ¶¶ 12–14]. Ultimately, Crockett attests, the assault culminated in him "laying face down in the blood from the mouth," after which he was placed in handcuffs, the lights were turned on, and "[t]wo staff . . . had to carry [Crockett] by the arms en route to the medical office." [Id. ¶ 14].

While in the medical clinic, Crockett avers, defendants attacked him again while he remained handcuffed. [Id. ¶¶ 15–19]. He attests, for instance, that Sergeant Sample grabbed Crockett by the throat and choked him, while the other officers in the room did nothing. [Id. ¶ 17]. Crockett further avers that he fell to the ground, after which Officer Beasley punched him with a closed fist in the back of the head. [Id.]. Next, Crockett avers, Sergeant Sample picked him off the ground, slammed him back on the floor, and "forcefully applied" his right knee to Crockett's back for about thirty seconds. [Id. ¶ 18]. Crockett avers further avers that the officers "laugh[ed] and taunt[ed]" him, saying "you need to learn who you don't mess with," and told the nurses to take Crockett's vitals but not to take pictures or write a report. [Id. ¶ 19].

Afterwards, Crockett avers, he "was carried to Segregation Housing Unit ['SHU'] 2C-B" and deposited in a cell where, for "several hours," he sat "on top of cold concrete in the critical [physical state . . . without the proper pain medication, blankets, a mattress, or sheets." [Id. ¶ 20]. Crockett attests that a night shift officer later "found [him] unresponsive on the cell floor severely unconscious and beaten." [Id.]. Crockett further avers that he was transported on a stretcher to the medical unit, where, for the next five hours (until morning shift began) he still was without sheets, blankets, and pain medication. [Id. ¶ 22].

Crockett attests that, because of "the severe aching from the pain and swelling and the nerve sensitivity from the tooth being exposed," he could not eat for the next four days. [Id.

3

¶ 24]. He was discharged from the medical unit around February 22, 2019, and taken back to the SHU. [Id. ¶ 25]. He adds that he was still in the same clothes and did not receive a shower between February 15, 2019 and February 23, 2019, and that he was "forced to miss meals because of the non-issuance of a soft diet." [Id.]. Additionally, Crockett avers, Sergeant Claiborne locked him in his cell for more than forty-eight hours with no recreation. [Id.]. When he was released from segregation on February 25, 2019, still using a wheelchair, Crockett was housed in the building where Sergeant Talley was the supervisor. [Id. ¶¶ 27–28]. Later, Sergeant Talley and Officer Beasley took Crockett's wheelchair, telling him that he is not authorized to have it. [Id. ¶ 28]. For the next three or four days, Crockett continues, he "was in so much pain [he] could not get out of bed." [Id. ¶ 29]. Eventually, he was taken to the medical unit, where he was prescribed nerve and pain medication. [Id.].

Afterwards, there was an investigation into the alleged assault. [Id. ¶ 34]. When Investigator Vaughan informed Crockett that the outcome of the investigation was unfavorable to him, Crockett left the room, and as he did so, Crockett avers, Vaughan said, "If you don't comply in the future they would assault you again." [Id.]. On April 2, 2019, Crockett was transferred to Nottoway Correctional Center. [Id. ¶ 36].

### B) Defendants' Statement of Undisputed Facts

Defendants' statement of undisputed facts is based on (1) a report authored by Investigator Vaughan on May 22, 2019, which contains the findings of his investigation of the alleged assaults [Def. Ex. 1]; (2) rapid-eye camera footage capturing activity in Housing Unit 3A and SHU Unit 2 [Def. Ex. 4A, 4B, 4C]; and (3) affidavits authored by Investigator Vaughan [Def. Ex. 2] and Lieutenant Jeffrey Smith [Def. Ex. 3].

Investigator Vaughan's report conflicts with Crockett's account of the events on February 15, 2019. For instance, the report includes a misconduct report stating that an inmate had been assigned to share a cell with Crockett, who refused to allow the other inmate into the cell. [Def. Ex. 1, at RRJ0127]. Corporal Brewton, who authored that misconduct report, wrote that she warned Crockett that "he is not single cell he can not [sic] refuse a cellmate," but Crockett nevertheless locked out the new cellmate. [Id.]. According to the misconduct report, Brewton told Crockett that he would go to the SHU if he refused to accept the cellmate. [Id.]. Brewton ultimately ordered Crockett's removal, but it took officers three tries to enter his cell because after it was unsecured, Crockett would re-secure it. [Id.]. Eventually, Sergeant Talley, Sergeant Holland, and Sergeant Sample were able to enter the cell, handcuff Crockett, and remove him from general population. [Id.].

Lieutenant Smith attests by affidavit to what he observed taking place inside of Crockett's cell. [Def. Ex. 3, Smith Aff.]. He avers that Sergeants Sample, Talley, and Holland entered the cell while he stood watch outside. [Id. ¶ 6]. Sergeant Talley informed Crockett that he was being relocated because he had refused to accept a roommate. [Id.]. After Crockett refused orders to present himself to be handcuffed several times, Lieutenant Smith entered the cell and instructed the officers to handcuff Crockett. [Id. ¶ 7]. Lieutenant Smith avers that "Crockett immediately became combative, pulling away from the officers," so he was "taken down to the floor so that he could be restrained." [Id.]. Next, Lieutenant Smith continues, Crockett was taken to the medical clinic for a pre-segregation medical evaluation. [Id. ¶ 8].

Below is a summary of the rapid-eye camera footage outside of Crockett's cell, as summarized by defendants:

> From around 00:09 to 00:49, correctional officers are seen gathering outside of Cell 02. Several inmates are congregating in the dayroom area. At

> around 00:50, there are a total of four (4) officers outside of Crockett's cell. The four officers were Lt. Smith, Watch Commander; Sgt. Sample; Sgt. Talley; and Sgt. Holland. Cpl. Brewton can be seen on Tier 2.
>
> An officer is seen opening Crockett's cell door. It is dark inside. Three officers gradually walk into Crockett's room with the third inside at around 00:58. The lights are almost immediately turned on. A fourth, Lt. Smith, stands sentry at Crockett's door, facing the day room. Several inmates are still congregating in the day room near Crockett's cell.
>
> The rapid eye footage does not show what happened within the cell....
>
> ... [A]t 01:24, Lt. Smith darts inside the cell. . . . At 01:52 . . . Cpl. Brewton descends from Tier 2 to help with security. Cpl. Brewton is seen calmly conversing with Lt. Smith . . .
>
> Thereafter, nearly two minutes pass as the officers calmly wait as the Housing Unit 3A inmates to go into lockdown. At 03:44, the Crockett [sic] emerges from Cell 02 in restraints, officers in tow. Ten seconds later, at 03:54, Crockett can be seen exiting Housing Unit 3A. He is wearing a clean white t-shirt. Crocket . . . has no visible signs of injuries. Crockett is not being "dragged" out of the housing unit. In fact, Crockett appears to actively resist the officers as they usher him out of Housing Unit 3A.
>
> Right at 04:00, Ofc. Beasley joins the group at the housing unit exit, relieving Sgt. Holland, who was injured.

[Def. Statement of Undisputed Facts ¶¶ 4–10 (citing Exhibit 4A)].

In the medical clinic, Lieutenant Smith avers, "Crockett once again became combative, threatening and cursing officers and medical staff." [Smith Aff. ¶ 9]. For instance, Lieutenant Smith asserts, he observed Crockett "lunge at Ofc. Beasley," so "[h]e was once again taken down to the floor for his safety and the safety of the officers and staff." [Id.]. According to Lieutenant Smith, "Crockett did not appear to have suffered any injury throughout this incident," and "Crockett's mouth did not appear to be bleeding." [Id. ¶ 10]. Lieutenant Smith additionally avers that Crockett walked to the SHU "on his own accord" from the medical clinic. [Id. ¶ 11].

Defendants submitted rapid-eye camera footage of the SHU hallway, which they summarize as follows:

> Beginning at 00:44, Crockett can be seen in the lower right quadrant walking down the hallway in Housing Unit 2 *en route* to SHU Cell 05. Right at 00:50 we get a clear front-facing shot of Crockett, wearing his clean white t-shirt

6

> and the glasses that were allegedly knocked off his face, in no apparent distress, walking calmly with several jail officers.[2]
>
> At 01:22, the top left quadrant shows Crockett up close calmly walking towards SHU 2. Clear pictures of his face and neck show no signs of injury. Crockett immediately emerges from the door shown in the top right quadrant. Again, Crockett looks very neat and he shows no signs of distress of injury. . . [in] the bottom left quadrant, Crockett is seen being escorted into the Medical Unit for his Presegregation Medical Screen. The last officer walks behind Crockett into the medical department at 01:50

[Def. Statement of Undisputed Facts ¶¶ 13–17 (citing Def. Ex. 4B)].

Defendants submitted a third rapid-eye video, which overlooks SHU Unit 2, and they summarize it as follows::

> The jail officers can be seen escorting Crockett to the Segregation Housing Unit and depositing him in Cell 05 on the ground level. Once again, we have a 360-degree view of Crockett in his clean white t-shirt. He is seen calmly walking on his own volition. He is deposited in his cell without incident. Crockett shows no signs of a recent, severe beating only moments before. He is not being "dragged" to his cell. He was not left in a top tier cell laying "on cold concrete in . . . a critical physical state."

[Id. ¶¶ 18–19 (citing Def. Ex. 4C)].

The investigative report submitted as evidence also contains Crockett's relevant medical records. A record from the evening of the alleged assault documents that Crockett had been found "sitting against the wall, head down" at 9:29 p.m., and, though he was breathing, he "was not responding at [that] time." [Def. Ex. 1, at RRJ0058]. Crockett was given ammonia, "but he [was] holding his breath." [Id.]. He was taken on a stretcher to the medical clinic. [Id.]. At 9:34 p.m., Crockett "open[ed] his eyes without difficulty" and was able to speak. [Id.] He said he was stabbed in the chest, "stomped on," and that "all of his bones were broken." [Id.]. The nurse observed no visible puncture wound, although the "[u]pper part of [his] chest [was] slightly reddened but no break in the skin," his lungs were clear, and he had "[n]o gross deformity." [Id.].

---

[2] The Court has viewed the video footage and, conversely, does not see Crockett wearing glasses.

Crockett remained in medical housing until he could be evaluated by a practitioner. [Id.]. He saw a nurse practitioner the next day, and he reported "left rib cage pain" from an altercation with guards the day before, but he "[r]efused to get up out of his bed and come to the door to be evaluated during the visit to his cell." [Id. at RRJ0072].

In a medical note from a mental health encounter on February 18, 2019, the counselor noted the following:

> [I]nmate states he did not know the pod officer was trying to put someone into his cell. [H]e shut the door a couple of times. [T]hen several officers came to his cell and told him to put his hands behind his back. [T]hey cuffed him and took him to medical. [T]hen he was put on the floor by the officers. [H]e is now reporting physical injuries from the officers holding him down on the floor. [H]is took [sic] was knocked out and he swallowed it. [S]tates he is not able to eat because his jaw is injured. [H]e has missed 6 meals. [H]e is requesting to be seen by the doctor.

[Id. at RRJ0080].

Crockett was also seen by a doctor and a dentist on February 18. First, he saw Dr. Bomar, who noted that Crockett had complained of ambulatory dysfunction and had reported that during an altercation with staff, he had been "stomped" and "punched," and now was having "difficulty moving neck," dizziness, nausea without vomiting, and "tingling" in his back. [Id. at RRJ0086]. The doctor further observed that Crockett had been "difficult to assess due to uncooperativeness" but ordered x-rays of the spine, cranium, and mandible, and prescribed ibuprofen. [Id. at RRJ0086, RRJ0089]. Crockett also was issued a soft diet for three days "to assist with his crown coming off the molar," and Dr. Bomar declined to extend the order when asked. [Id. at RRJ0107].

Later that day Crockett saw a dentist, Dr. Crawford, to whom he reported that he had lost and swallowed a "crown on #9" during an altercation and now was experiencing tenderness. [Id. at RRJ0090]. The dentist observed that Crockett could talk normally. [Id.]. The dentist

8

additionally told Crockett that "due to minimal coronal structure/lack of retention, he will have to take care with any subsequent crown because it will be equally likely to come off with minimal force." [Id. at RRJ0092].

During a follow-up appointment with Dr. Bomar on February 21, the doctor observed that Crockett "refuse[d] to ambulate when asked but [was] able to do so." [Id. at RRJ0102]. The medical record further reflects that all x-rays were "negative" and showed no fracture, misalignment, or soft tissue changes. [Id. at RRJ0104].

Investigator Vaughan initiated the investigation into the alleged assault after he learned on March 4, 2019, that a non-prisoner (Niacaris Leadis, who identified herself as Crockett's girlfriend) had contacted the jail to report that Crockett told her that officers had assaulted him without provocation. [Def. Ex. 2, Vaughan Aff. ¶ 4]. As part of the investigation, Investigator Vaughan interviewed Crockett, who sought to press criminal charges against Sergeants Talley and Sample for the felonies of malicious wounding by mob and robbery. [Id. ¶¶ 8–9]. On March 20, Investigator Vaughan shared his investigation file with Sergeant James Nicholas, a police officer for Prince George County, who declined to conduct his own investigation—a necessary step when a citizen seeks to press felony charges—after concluding that the jail officers committed no crime. [Id. ¶¶ 10–11]. Later that day Investigator Vaughan met with Crockett and informed him that Sergeant Nicholas declined to pursue criminal charges and that the internal jail investigation had been completed with the conclusion that "the Use of Force Incident was not an excessive or improper use of force." [Id. ¶ 12]. He further "advised Crockett that if in the future, if he did not comply with, or do what the staff told him to do, they would be forced to put their hands on him again, to maintain the security of the jail," with the intention of "help[ing] Crockett

9

gain insight into his role in the Use of Force Incident," specifically, his "insubordinate and combative behavior throughout the Use of Force Incident." [Id. ¶ 13].

## II. Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Hupp v. Cook, 931 F.3d 307, 317 (4th Cir. 2019) (internal quotation marks and citations omitted). In evaluating a summary judgment motion, the Court views the evidence, and draws all inferences, in the light most favorable to the nonmoving party. See E.W. by T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018).

## III. Analysis

### A) Excessive Force Claims

Defendants argue that summary judgment in their favor is warranted on the excessive force claims because, in their view, "Crockett cannot come forward with any evidence, beyond his own self-serving statements, that excessive force was used against him on February 15, 2019." [Def. Summ. J. Br., at p. 17]. They urge that "Crockett's self-serving story is so significantly contradicted by the Rapid Eye Footage and other evidence available in this case as to render it worthless." [Id.].

An excessive force claim has an objective and subjective component. Dean v. Jones, 984 F.3d 295, 302 (4th Cir. 2021). The objective component "measures the nature of the force employed, asking whether that force was sufficiently serious to establish a cause of action." Id. (internal quotation marks and citation omitted). "[D]e minimis or trivial force is not enough, but

anything more will suffice" to satisfy this component. Id. For the subjective component, the question is "whether the officers acted with a sufficiently culpable state of mind." Id. (internal quotation marks and citation omitted). A successful claim turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Id. (quoting Whitley v. Albers, 475 U.S. 312, 320–21 (1986)).

The Court cannot agree with defendants that the record forecloses Crockett's claims of excessive force. True, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). The type of record evidence this applies to is that "of undisputed authenticity," like a video, which may "show[] some material element[] of the plaintiff's account to be 'blatantly and demonstrably false.'" See Harris v. Pittman, 927 F.3d 266, 276 (4th Cir. 2019) (quoting Blaylock v. City of Philadelphia, 504 F.3d 405, 414 (3d Cir. 2007)). That is not the case here.

There is no video footage of the alleged assaults in Crockett's cell and in the medical unit. The video footage captures only what Crockett looked like after each alleged assault. In an effort to get around the he-said, she-said accounts of the use of force incidents—typically the province of a jury to determine with whom to agree, see McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52, 255 (1986))—defendants argue that no reasonable jury could believe Crockett's account of what took place principally because of how he looked afterwards.[3] They point to what they

---

[3] Defendants point to additional inconsistencies in the video and Crockett's affidavit, like that Crockett avers that he was attacked in the dark yet the video footage shows that the cell light was turned on shortly after the officers entered the cell. But this fact is not material to whether the

11

describe as his "gleaming white t-shirt," which, in their view, proves that Crockett could not have been "laying face down in blood." [Def. Summ. J. Br., at p. 18]. But just because Crockett's t-shirt did not get blood on it does not mean that a reasonable juror could not conclude that Crockett's face—the front of which there is no close-up, clear view—could not have been bloodied. Defendants further contend that in Exhibit 4B, Crockett is seen "walking calmly with several jail officers" and "his face and neck show no signs of injury." [Def. Statement of Undisputed Facts ¶¶ 15–16]. But "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts," so "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins v. Gaddy, 559 U.S. 34, 38 (2010). Because "[t]he extent of injury may also provide some indication of the amount of force applied," it is certainly a relevant factor for a juror to consider. See id. at 37. Ultimately, defendants' evidence—a clean t-shirt, a calm demeanor, and a lack of visible bruises on a zoomed-out video—may sow doubt as to the veracity of Crockett's version of events; it does not demonstrate that Crockett's account of the attack is demonstrably false.

Defendants further contend that Crockett cannot meet the subjective component for the excessive force claims because the undisputed evidence demonstrates that the officers came to his cell to take him to the SHU for refusing to accept an inmate. In evaluating the subjective component courts weigh four factors:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response.

---

officers committed excessive force. Rather, it is material to Crockett's credibility, an issue for the jury.

Dean, 984 F.3d at 302 (internal quotation marks and citations omitted). Even accepting as true, for the sake of argument, defendants' asserted reason for applying force, a jury reasonably could conclude that the type of force Crockett describes was applied gratuitously because "even where an initial use of force does not by itself raise questions about a corrections officer's intent . . . the continued application of force may give rise to an inference that force was used for malicious or punitive purposes." See Brooks v. Johnson, 924 F.3d 104, 114 (4th Cir. 2019). Disputes of material fact therefore preclude summary judgment on Crockett's excessive force claim.

### B) Claims against Investigator Vaughan

Defendants construe Crockett's complaint as raising two individual claims against Investigator Vaughan: (1) Vaughan interfered with Crockett's access to the courts; and (2) Vaughan threatened Crockett. Neither of these claims are viable.[4] For the former claim, "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another," so Crockett cannot pursue a claim against Investigator Vaughan for his alleged role in the police department's decision not to press criminal charges against the defendant officers. See Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973); see also Lopez v. Robinson, 914 F.2d 486, 494 (4th Cir. 1990). For the latter claim, as the Court already explained in its screening Order, "comments that may constitute verbal abuse or harassment by themselves do not rise to the level of an Eighth Amendment violation." See [Dkt. No. 31 (citing Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979); Emmons v. McLaughlin, 874 F.2d 351, 354 (6th Cir. 1989);

---

[4] Conversely, the Court construes the claim brought against Investigator Vaughan arising from the alleged threat as one brought under the First Amendment for unlawful retaliation. Defendants' motion for summary judgment does not address this claim.

Lamar v. Steele, 698 F.2d 1286 (5th Cir. 1983)]. The Court therefore will grant summary judgment to defendants on these claims against Investigator Vaughan.[5]

### C) Conditions of Confinement Claims

Defendants argue that the undisputed facts do not demonstrate that Crockett had been placed in unconstitutional conditions of confinement. For a convicted inmate like Crockett to prevail on a claim of unconstitutional conditions of confinement, he must put forth evidence demonstrating that he suffered an extreme deprivation of a basic human need, which the defendants knew of but disregarded. See Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). To be extreme, the alleged deprivation must have resulted in "a serious or significant physical or emotional injury" or pose "a substantial risk of such serious harm resulting." Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (internal quotation marks and citation omitted).

Defendants are entitled to summary judgment in their favor on the conditions of confinement claim. Crockett avers that the conditions he was subjected to in the SHU violated his Eighth Amendment rights because he was placed there for "several hours" on "cold concrete" without blankets, a mattress, or sheets, and then endured similar conditions for a few more hours after his transfer to the medical unit. [SAC ¶ 20]. He also attests that he was unable to shower from February 15, 2019 through February 23, 2019, and that there were "times when plaintiff would be locked in the cell more than 48 hours without receiving recreation by Sergeant V. Claiborne." [Id. ¶ 25].

---

[5] The complaint briefly alleges that on March 6, 2019, Crockett "asked the librarian for a form on the computer" and "if plaintiff had not demanded the forms, the librarian would withhold crucial forms from inmate in order to delay, frustrate, and deprive inmates of their right to the court." [SAC ¶ 31]. The law librarian, however, is not a defendant in this lawsuit, so neither is an access-to-courts claim based on this allegation.

First, the alleged conditions in Crockett's SHU and medical cells, which he experienced for a few hours only, perhaps were uncomfortable, but they do not give rise to an Eighth Amendment violation. See Baldwin v. Hieatt, No. 7:15cv00244, 2016 WL 69910, at *1 (W.D. Va. Jan. 5, 2016) (observing that, "[w]hile sleeping on a concrete floor with no mattress for nearly six months may have been uncomfortable and inconvenient, [plaintiff] has not alleged that he suffered a serious or significant physical or emotional injury as a result of the sleeping arrangement" and therefore failed to state conditions-of-confinement claim).

Second, concerning recreation, a "complete deprivation of exercise for an extended period of time violates Eighth Amendment prohibitions against cruel and unusual punishment." Mitchell v. Rice, 954 F.2d 187, 191 (4th Cir. 1992). But forty-eight hours is hardly an extended period. Moreover, Crockett has not explained how two days without recreation seriously injured him or posed a serious risk of harm, particularly given his alleged extensive injuries.

Finally, for the claim related to his inability to shower for eight days, there also is insufficient evidence to support a claim at this stage. Lacking the ability to shower, on its own, does not give rise to an Eighth Amendment claim. See Shakka, 71 F.3d at 167–68 (4th Cir. 1995) (concluding that denial of shower for three days after inmate had human excrement thrown on him, when prison otherwise provided water and cleaning materials, did not deprive prisoner of "the minimal civilized measures of human necessities in such a palpable way that injury should be inferred"); Davenport v. DeRobertis, 844 F.2d 1310, 1316-17 (7th Cir. 1988) (concluding that one shower a week for inmates in segregation is constitutionally sufficient and finding no constitutional support underlying injunction requiring prison to allow segregated inmates to take three showers per week when those inmates could wash daily using sink in cell). Crockett has

not put forth evidence that he was otherwise unable to bathe and, therefore, the Eighth Amendment conditions of confinement claim on this, or any of the alleged bases, cannot prevail.

## IV. Conclusion

For the reasons stated above and in an Order that will accompany this Memorandum Opinion, defendant's motion for summary judgment will be granted in part, with respect to the conditions of confinement claims and the individual claims against Investigator Vaughan, and denied in part, with respect to the excessive force claims.

Entered this 21st day of March 2022.

Alexandria, Virginia

/s/
Anthony J. Trenga
United States District Judge